IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FEB 2 2 2013

CLERK, U.S. ....... ..RT
RICH...... VA

UNITED STATES OF AMERICA,

v.                                    Criminal No. 3:12cr137-01

KOLON INDUSTRIES, INC.,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on defendant Kolon Industries, Inc.'s ("Kolon") MOTION TO QUASH SERVICE AND TO DISMISS INDICTMENT (Docket No. 21). For the reasons set forth herein, the motion is granted in part and denied in part.

## BACKGROUND

On August 21, 2012, a federal grand jury returned a six count Indictment (Docket No. 3) against Kolon, as well as five individuals, Kolon's officers and employees, alleging that they and others had participated in a conspiracy to convert trade secrets, in violation of 18 U.S.C. § 1832(a)(5), the theft of trade secrets, in violation of 18 U.S.C. §§ 1832(a)(2) & 2, and obstruction of justice, in violation of 18 U.S.C. §§ 1512(c) & 2. The Indictment was unsealed on October 18, 2012 pursuant to an Order entered on October 10, 2012 (Docket No. 11) and a Notice filed by the United States on October 18, 2012 (Docket

No. 12). On October 2, 2013, a Summons (Docket No. 9) was issued by the Clerk of the Court ordering Kolon to appear before the Court on December 11, 2012 at 1:30 p.m.[1]

On December 10, 2012, Kolon filed its MOTION FOR LEAVE TO ENTER LIMITED AND SPECIAL APPEARANCES (Docket No. 15), seeking leave for its counsel to enter special appearances for the sole purpose of challenging sufficiency of service upon the defendant and seeking to quash the summons and dismiss the Indictment. In its supporting Memorandum (Docket No. 16), Kolon declared that it would not appear at the scheduled arraignment "due to absence of effective service." Id. at 2.

On December 11, 2012, the case was called timely at 1:30 p.m. EST and neither Kolon nor the counsel who had signed the motion for leave to enter limited and special appearances appeared. The United States appeared through representatives of the Office of the United States Attorney for the Eastern District of Virginia and of the Criminal Division of the United States Department of Justice. At that hearing, the Court continued the arraignment until March 6, 2013 at 10:00 a.m. EST.

---

[1] Extradition proceedings were initiated against the individual officers and employees of Kolon.

Immediately following the hearing, the United States filed its POSITION ON SERVICE (Docket No. 18),[2] in which the United States detailed the various ways in which it had effectuated service of the summons on Kolon and asked the Court to order Kolon's appearance at the March 6 arraignment date upon penalty of contempt of court.

On December 13, 2012, the Court entered an Order (Docket No. 20) granting the motions for leave to enter a special appearance, instructing Kolon to file its motion to quash, and setting a briefing schedule and argument date on that motion. Extensive briefing followed, including an opposition (Docket No. 25), a reply (Docket No. 28), a sur-reply (Docket No. 33) and a response to the sur-reply (Docket No. 37). On February 4, 2013, the Court entered an Order (Docket No. 36) requiring supplemental briefing on several specific issues. Responses were filed by the United States (Docket No. 38) and by Kolon (Docket No. 39). Argument was held on February 8, 2013. The motion is ripe and ready for review.

## DISCUSSION

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." Murphy Bros., Inc. v. Michetti Pipe

---

[2] The POSITION ON SERVICE had been delivered to chambers and to counsel for Kolon immediately prior to the scheduled hearing.

Stringing, Inc., 526 U.S. 344, 350 (1999). Indeed, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Omni Capital Int'l, Ltd. V. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987). Proper service of the summons constitutes a requirement beyond "notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum." Id. Absent a voluntary appearance by the defendant, the Court simply cannot exercise jurisdiction over a defendant, particularly a defendant that is not a resident of this District, if the service of process was not completed. See Knowles v. Logansport Gaslight & Coke Co., 86 U.S. 58, 62 (1873) ("[I]n the case of non-residents, like that under consideration, personal service cannot be dispensed with unless the defendant voluntarily appears.").

## A.   The Federal Rules of Criminal Procedure

Fed. R. Crim. P. 9 instructs that, where the government elects to proceed by indictment, "[t]he court must issue a warrant--or at the government's request, a summons--for each defendant named in an indictment." Fed. R. Crim. P. 9(a). Rule 9 goes on to explain that a summons "must be in the same form as a warrant except that it must require the defendant to appear before the court at a stated time and place." Fed. R. Crim. P. 9(b)(2). The reader is then directed to Fed. R. Crim. P. 4(b)(1)

for the form of the warrant and is further informed that "[t]he warrant must be executed or the summons served as provided in Rule 4(c)(1), (2), and (3)." Fed. R. Crim. P. 9(b)(1) & 9(c)(1)(A).

Rule 4, in turn, provides that the summons must contain, in addition to the "stated time and place," (1) the defendant's name, (2) the offense charged, and (3) the signature of a judge. Fed. R. Crim. P. 4(b)(1)(A)-(D). The summons

> [I]s served on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process. A copy must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States.

Fed. R. Crim. P. 4(c)(3)(C). Following service, "[t]he person to whom a summons was delivered for service must return it on or before the return day." Fed. R. Crim. P. 4(c)(4)(B).

Kolon argues that Rule 4 imposes two separate and distinct requirements on the government in order to effectuate service of a summons: (1) that a copy be delivered "to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process" and (2) that a "copy . . . be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States." Kolon Mot. to Quash ("Kolon

Mot.") (Docket No. 21) at 6 (quoting Fed. R. Crim. P. 4(c)(3)(C)). In Kolon's view, failure to comply with the second sentence of the rule (the so-called "mailing provision"), even where it would be impossible to do so, defeats any attempt at service and strips the Court of personal jurisdiction. Kolon Mot. at 15.

There is no question, and the parties agree, that <u>delivery</u> is a jurisdictional requirement. <u>See</u> Govt. Resp. in Opp. to Def. Mot. to Quash ("Govt. Opp.") (Docket No. 25) at 7; Kolon Mot. at 6. There is substantial disagreement over whether or not the mailing provision constitutes a requirement of service or an additional notice requirement. If the former, then the Court cannot exercise jurisdiction over a defendant; if the latter, then failure to comply might result in the government being admonished for not accomplishing the impossible, but would not be a bar to prosecution of the case. If Kolon's position is correct, then almost none of the government's attempts to effectuate service could have been successful because they would not have satisfied the mailing provision. Given that argument, it is appropriate first to resolve whether the fact that a corporation does not have a former address in the District or a principal place of business within the United States serves as

an absolute bar to service of a criminal summons under Rule 4.[3]

## B.  The Mailing Provision

The first sentence of Rule 4(c)(3)(C) contains what is often termed the "delivery provision." The second sentence contains what is called the "mailing provision" which provides that "[a] copy [of the summons] must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States." Fed. R. Crim. P. 4(c)(3)(C). The parties agree that Kolon has no last known address within the Eastern District of Virginia and has no principal place of business within the United States. See Govt. Pos. at 7; Kolon Mot. at 14.

The United States makes several arguments to support its claim that it adequately complied with the "mailing requirement." For one, the United States indicates that it mailed a copy of the summons to the "last known place of business within the United States." Govt. Pos. at 5. It mailed the summons to Kolon USA. Govt. Pos. at 6. The United States also emailed the summons to an email address of a H.S. Yoon who

---

[3] Of course, unlike some number of foreign corporations that might be indicted for criminal activity which never had an address in any district of the United States, Kolon would be amenable to process under Rule 4 in the District of New Jersey if venue were appropriate there. Although Kolon does not have, and never had, a principal place of business in the United States, it does have a "last known address" in New Jersey.

was listed on the Kolon website as the "contact point" for the Aramid product. Govt. Pos. at 5.

Kolon responds that none of these efforts are sufficient to comply with the "mailing provision" because, says Kolon, the mailing provision is perfectly clear: the summons must be (1) mailed to (2) the organization at (3) an address in the United States. See Kolon Mot. at 14. Under this interpretation, neither mailing the summons to Kolon USA (a different organization) nor sending the email to Mr. Yoon (not mail) nor mailing the summons to Kolon Industries in Korea (not in the United States) would be sufficient to comply with the terms of the Rule.

It is clear that the United States did not strictly comply with the mailing provision and, further, that it would be impossible for the United States to do so (unless it brought the prosecution in New Jersey). The real question is what effect the failure (and the inability) to comply with the mailing provision has on the service of the summons.

The United States takes the view that the "mailing provision" is not a "strict jurisdictional requirement" in the way that the "delivery" requirement clearly is. Govt. Resp. at 8. In support of that view, the United States emphasizes the number of federal criminal statutes that criminalize behavior that took place overseas and suggests that these statutes would lose their meaning if service on foreign organizations could not

be effectuated because of the impossibility of satisfying the mailing provision. Id. at 8. As the United States notes, both the trade secret and obstruction of justice statutes at issue here provide for liability that would reach foreign corporations. The United States construes Kolon's position that the mailing provision is jurisdictional as reading an "implied exception" into the criminal statutes for foreign corporate defendants who do not have an address in the United States (that is, the criminal statutes plainly encompass a number of foreign corporations who could be indicted under the statutes, but who could never be tried because of the mailing provision of Rule 4). Kolon, in essence, agrees that would be the effect of its position because "service of a summons upon a corporation is effective only if the Government satisfied both the Delivery and Mailing requirements." Kolon Reply at 2 (emphasis in original). Thus, if the mailing provision could not be satisfied, the putative offender could not be brought to court.

The mailing provision of Rule 4(c)(3)(C) has been addressed rather infrequently, and then only recently, as it pertains to foreign corporate defendants. See United States v. Dotcom, No. 1:12cr003, 2012 WL 4788433 (E.D. Va. Oct. 5, 2012); United States v. Pangang Corp., 879 F. Supp. 2d 1052 (N.D. Cal. 2012); United States v. Alfred L. Wolff GMBH, No. 08 CR 417, 2011 WL 4471383 (N.D. Ill. Sept. 26, 2011); United States v. Chitron

Elec. Co, 668 F. Supp. 2d 298 (D. Mass. 2009); <u>United States v.</u> <u>Johnson Matthey PLC</u>, No. 2:06-CR-169, 2007 WL 2254676 (D. Utah Aug. 2, 2007). In <u>Pangang</u>, <u>Wolff</u>, and <u>Chitron</u>, the question of service focused on whether service on a subsidiary of a foreign defendant was sufficient to comply with Rule 4. <u>Wolff</u> and <u>Chitron</u>, and in large part, <u>Matthey PLC</u> turn on an "alter ego" assessment. Hence, those decisions are not helpful in assessing the meaning of the mailing provision. However, in <u>Johnson Matthey PLC</u> and <u>Dotcom</u>, the courts confronted that question and reached considerably different results.

In <u>Johnson Matthey PLC</u>, the foreign corporate defendant had no "last known address in the district" and "no principal place of business elsewhere in the United States." <u>Johnson Matthey PLC</u>, 2007 WL 2254676 at *2. Without any analysis, the court appears to have applied the second sentence of Rule 4(c)(3)(C) literally and granted the foreign defendant's motion to quash service of the summons. In <u>Dotcom</u>, the Alexandria Division of this Court took the view that "the Rule does not include this mailing provision in the previous sentence, where it explains how a summons is actually <u>served</u>." <u>Dotcom</u>, 2012 WL 4788433 at *1 n.1 (emphasis in original), and thus concluded that the mailing provision is not a requirement for valid service.

Kolon asks the Court to look at the "plain language" of the Rule. <u>Id.</u> at 3 (quoting <u>U.S. Dep't of Labor v. N.C. Grower's</u>

10

Ass'n, 377 F.3d 345, 350 (4th Cir. 2004)). As the Supreme Court has instructed, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). The Court must do just that.

The first sentence of Rule 4 provides that "[a] summons *is served* on an organization by delivering a copy" to an appropriate individual. Fed. R. Crim. P. 4(c)(3)(C) (emphasis added). "A copy must also be mailed to the organization's last known address within the district or to its principal place of business elsewhere in the United States." Id. (emphasis added). Quite clearly, the first sentence of the Rule concerns itself with how a summons is to be served ("a summons is served") on an organization under the Federal Rules of Criminal Procedure.[4] And, just as clearly, service, under the Rule, is effected by delivering the summons to a specifically enumerated set of persons: "an officer, [] a managing or general agent; or [] another agent appointed or legally authorized to secure service of process."

The second sentence does not mention service. Instead, it simply requires that a copy of the summons also be mailed to the entity that is to be served under the first sentence; and it

_____

[4] As discussed later, service of a summons may be made pursuant to authority other than these rules.

11

specifies that the mailing may be addressed to one of two locations. But, the text of the second sentence does not articulate that mailing to one of those locations is a constituent element, or a prerequisite, of valid service.

Thus, a textual reading of Rule 4(c)(3)(C) in its entirety teaches that service under the rules is to be accomplished as prescribed in the first sentence of the Rule. And, the second sentence merely provides an additional means of providing notice to the organization that is to be served pursuant to the first sentence. Certainly, nothing in the text of the mailing provision suggests that the organization has not been properly served upon compliance with the first sentence merely because the organization has no last known address in the district or no principal place of business elsewhere in the United States to which a copy of the summons could have been mailed.

This rather straight-forward textual reading of Rule 4(c)(3)(C) is consistent with, indeed fully supported by, the settled canon of construction that courts have "some scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute." Helvering v. Hammel, 311 U.S. 504, 511 (1941) (internal citations omitted); see also United States v. Rippetoe, 178 F.2d 735, 737 (4th Cir. 1949) ("[T]he rule is well

settled that all laws are to be given a sensible construction and that a literal application of language which leads to absurd consequences should be avoided whenever a reasonable application can be given consistent with the legislative purpose. Exceptions are read into the general language when necessary to avoid absurd consequences and carry out the purpose of the legislature.") (cited with approval in United States v. Joshua, 607 F.3d 379, 385 (4th Cir. 2010); Unif. Statute and Rule Constr. Act § 18(a)(3) (1995); 73 Am. Jur. 2d Statutes § 163 (2013). And, to read the second sentence to impose an obligation that could not possibly be satisfied would produce an absurd result. As Judge O'Grady observed in Dotcom:

> It is doubtful that Congress would stamp with approval a procedural rule permitting a foreign corporate defendant to intentionally violate the laws of this country [thereby causing harm to its citizens], yet evade the jurisdiction of United States' courts by purposefully failing to establish an address here.

Dotcom, 2012 WL 4788433 at *1.

The Court declines Kolon's invitation to follow a course that produces an absurd result and that would impute to Congress the intent to produce a nonsensical consequence. In enacting the trade secret statutes, under which Kolon is charged, Congress plainly provided that their terms are applicable to foreign defendants where "an act in furtherance of the offense was

committed in the United States." 18 U.S.C. § 1837(2). Further, the trade secret statute and the obstruction of justice statute each clearly contemplates applicability of the statute to an organizational defendant. See e.g., 18 U.S.C. § 1832(b) (providing the maximum penalty for an "organization that commits any offense" described in the statute). To find that a foreign corporation effectively could immunize itself from prosecution for violating those statutes by maintaining its principal place of business outside the country would reach an absurd result and one which the Court cannot conclude was intended by Congress when it approved Rule 4(c)(3)(C). The Court declines to construe the procedural rule to thwart the purpose of the substantive criminal statutes themselves.

For the foregoing reasons, the "mailing provision" of Rule 4(c)(3)(C) is not a component of effective service of a summons. Nor is mailing a necessary prerequisite to the exercise of jurisdiction over a foreign corporation which does not have a "last known address within the district or to its principal place of business elsewhere in the United States."[5]

## C. Government's Attempts at Service

Having concluded that the mailing provision does not

---

[5] The Court need not, and does not, reach the question of whether the mailing provision would serve as a jurisdictional bar to prosecution where it could have been complied with and simply was not effectuated properly.

14

constitute a requirement of service (and, by extension, does not pose a bar to service in this case), the Court next must determine whether the United States effectuated delivery of the summons to "an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process" for Kolon. In its initial position on service, the United States identified a number of modes by which it believed that it had effectuated delivery to Kolon. Govt. Pos. on Service ("Govt. Pos.") (Docket No. 18) at 2-3. They were:

- On October 18, 2012, the United States emailed a copy of the indictment to Thomas O'Brien, an attorney at Paul Hastings LLP, who was known to have represented Kolon in civil matters before this Court. Govt. Pos. at 2.

- On October 18, 2012, the United States mailed copies of the summons by certified mail to Kolon's last known address in the State (and District) of New Jersey. Id.

- On October 19, 2012, the United States emailed a copy of the summons to an email address that it found on Kolon's public website, which identified a H. S. Yoon as the "contact point" for the Aramid product. Govt. Pos. at 2-3.

- On October 23, 2012, the United States served the summons on a Jong Sik Yang, who is the president of Kolon USA, Inc. ("KUSA"). There is some dispute over this process. Kolon maintains that Mr. Yang refused to accept service, informing the federal agent that he could not accept service on behalf of Kolon Industries, Inc., and that the summons was left, ten days later, in a KUSA mailbox. See Kolon Mot. at 10. The United States maintains that Mr. Yang was personally served by the FBI agent and that the summons was left with Mr. Yang. Govt. Opp. at 17.

- On October 24, 2012, the United States served the summons upon Sung Gu Hong, who is the Treasurer for KUSA, who had also been the registered agent for Kolon Industries in New

Jersey until 2007. Mr. Hong avers that he made numerous attempts to inform the FBI agents that he was not able to accept service on behalf of Kolon Industries. See Hong Decl. (Docket No. 21-3). The United States was persistent, including going to Mr. Hong's house and demanding that his wife accept service. Id. at ¶ 13. The next day, an FBI agent came back by the KUSA offices. Mr. Hong maintains that he continued to refuse to accept service, Hong Decl. ¶ 14; the United States maintains that service was effectuated upon Mr. Hong at that point. Govt. Opp. at 14.

- On October 26, 2012, the United States mailed certified copies of the summons to KUSA's address in New Jersey, the United States attached a copy of the certificate of delivery to its position. Docket No. 18-10. It does not show any signature or information regarding delivery. According to Mr. Hong, the delivery was refused by KUSA personnel and a copy of the summons was deposited, about ten days later, without being signed for, in the KUSA mailbox with a "certified mail" sticker on it. Hong Decl. ¶ 16.

- On October 18, 2012, the United States transmitted to the government of the Republic of Korea ("South Korea") a copy of the summons for service pursuant to the Mutual Legal Assistance Treaty ("MLAT"). Govt. Pos. at 2. The parties agree that delivery of the summons to Kolon by the South Korean authorities was made on December 13, 2012, which was two days after the date on which the summons commanded Kolon to appear for arraignment. According to a report from the Korean Ministry of Justice, the summons was delivered to a Mr. Manhho Kim, who is described as "a staff of Kolon handling documents." See Exhibit B, Govt. Supp. Br. On January 10, 2013, the United States mailed to Kolon's headquarters in Korea the Court's order continuing the arraignment.

- In a letter dated January 4, 2012 (but presumably meaning 2013), the United States provided the New Jersey Secretary of State a copy of the summons, the Court's December 13 Order, and information regarding Kolon's former registration in New Jersey. The summons served on the New Jersey Secretary of State ordered an appearance on December 12, 2012. See Letter from Kosta Stojilkovic, Asst. U.S. Attn'y, to New Jersey Sec'y of State (Docket No. 25-3). This summons was served on the Secretary of State on January 8, 2013.

16

Since its initial filing, the United States has abandoned several of these reasons for claiming that service had been effectuated. Some were abandoned because they were transparently ineffective.[6] Others were abandoned when the United States discovered facts inconsistent with the basis for the claim.[7] Nonetheless, the United States continues to assert as legally sufficient four methods through which it purports to have effectuated delivery of the summons: (1) that it served the New Jersey Secretary of State pursuant to N.J. Stat. § 14A:13-8(c);

---

[6] For example, it cannot be the case that an email to an attorney who had represented the client in another (civil) matter, but who had not represented himself as authorized to accept service nor had indicated any intention to appear on behalf of the client in this case, constituted service. Similarly, the United States has not pressed the claim that emailing a copy of the summons to an email address listed as a sales contact point for a particular product on the Kolon website constituted "delivery to an officer" or "agent," particularly in perspective of the fact that the United States quite clearly had no idea who received that email (Kolon attached declaration from a Mr. Yoon indicating that he was the recipient of the emails and that he did not have any authority to accept service, or really to do much of anything at all. See Yoon Decl. (Docket No. 21-2) at ¶ 2.).

[7] For example, the United States abandoned the claim that service on Mr. Hong was sufficient when confronted with the fact that Kolon had obtained a Certificate of Withdrawal from the New Jersey Secretary of State in December 2006 and that New Jersey law plainly provides that, once the certificate is issued, "the authority of [the corporation's] registered agent in this State to accept service of any process against the corporation shall be deemed revoked." N.J. Stat. § 14A:13-8(2)(b). See Tr. at 54:5-12 (Mr. Stojilkovic: "[W]e no longer contend that service on Sung Gu Hong creates jurisdiction in this case." Mr. Stojilkovic then explains that the certificate of withdrawal removed Mr. Hong's authority to accept service.).

(2) that KUSA constituted a "general agent" of Kolon as defined by Rule 4; (3) that, notwithstanding an agency relationship, KUSA constituted the "alter ego" of Kolon such that service on KSUA was service on Kolon; and (4) that service was effectuated pursuant to the Mutual Legal Assistance Treaty ("MLAT") entered into between the Republic of Korea and the United States of America. Each will be considered in turn.

**D.    Service on the New Jersey Secretary of State**

Although accepting, as it must, that the certificate of withdrawal obtained from the New Jersey Secretary of State in December 2006 stripped Kolon's former registered agent of the ability to accept process on behalf of Kolon, the United States maintains that the act of withdrawal makes Kolon amenable to service through the New Jersey Secretary of State. In so arguing, the United States relies on a provision in the New Jersey statute that provides for service on the Secretary of State for claims against defunct corporations in certain, limited, situations. The statute provides:

> The corporation shall be deemed to have irrevocably consented that service of process in any action or proceeding based upon any liability or obligation incurred by it within this State before the issuance of the certificate of withdrawal may thereafter be made on such corporation by service thereof on the Secretary of State or the chief clerk in his office.

N.J. Stat. Ann. § 14A:13-8(c) (emphasis added).

Kolon's position is based upon the requirement that the liability must have been "incurred . . . _within_" New Jersey for service through the Secretary of State to be appropriate. See Kolon Reply at 10. The United States responds that there was a meeting with Michael Mitchell in New Jersey (a meeting that Kolon claims was unrelated to the alleged conspiracy) and that this constituted an act in furtherance of the conspiracy. Govt. Sur-reply at 6. The United States also relies on a New Jersey intermediate appellate court decision in Corporate Development Specialists, Inc. v. Warren-Teed Pharmaceuticals, Inc., 240 A.2d 450 (N.J. Super. A.D. 1968). That case is inapposite to the present issue.

In Corporate Development Specialists, the Appellate Division of the Superior Court held that the courts of New Jersey could assert personal jurisdiction over a Delaware corporation (based in Ohio). The court rejected the claim that, "regardless of the substantiality and continuity of defendant's sales activities in this State, there could be no jurisdiction over it for the reason alone that the cause of action sued on was unrelated to sales of defendant's products here." 240 A.2d at 452. The court remanded the case to the trial court to determine the extent of the defendant's contacts with New Jersey. Id. at 453. Notably, the court observed that "[s]ervice of process against defendant in this action was effected by

registered mail to defendant's Ohio office pursuant to R.R. 4:4-4(d), which so permits as against a foreign corporation, 'subject to due process,' where it has no officers or agents, or registered office, available for service in this State." Id. at 452.

Corporate Development Specialists addressed whether in personam jurisdiction could be asserted over a foreign corporation "only on a cause of action arising from activities of the defendant within the forum state." Id. (emphasis in original). Contrary to the assertion made here by the United States, that decision does not inform the present analysis. Rather, the court in Corporate Development Specialists merely arrived at the now quite familiar concept that, "[e]ven when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation." Helicopteros Nacionales de Colombia, SA v. Hall, 466 U.S. 408, 414 (1984). However prescient the New Jersey court appears to have been on that subject, it is simply not the subject at issue here. The issue here is not whether due process permits Kolon to be subjected to jurisdiction in the Eastern District of Virginia, but rather whether the United States provided sufficient service of process

to allow the Court to view Kolon as having been brought before it.

The New Jesey statute on which the United States relies is quite narrow in scope to provide a limited exception to a general rule that withdrawal from New Jersey revokes the ability of the appointed local agent to receive process. Its text cannot be viewed as intended to reach so far as to simply provide an alternative means for service for a corporation that has no address in the United States; indeed, the New Jersey Court Rules ("R.R.") plainly contemplate and address such a situation. See R.R. 4:4-4(b)(1)(B) (jurisdiction obtained by effecting service pursuant to treaty). The United States cites no authority for the proposition that this statute can be used to serve a criminal summons from a foreign jurisdiction.

The "Commissioner's Comment" to § 14A:13-8 explicitly indicates that the "authority of the Secretary of State under paragraph 14A:13-8(2)(c) is expressly narrower than the authority of the registered agent under subsection 14A:4-2(1)." N.J. Stat. Ann. § 14A:13-8 Commissioners' Comment – 1968. In other words, the provision cannot be viewed as simply a temporal extension of the registered agent's ability to accept process.

The comment also explains that the "instances" in which the Secretary of State is intended to be able to accept process is

"derived from" N.J. Stat. Ann. § 2A:15-26(b)[8] and the statute, as a whole, is modeled on "subparagraph 1310(a)(5) of the New York Act," which appears to refer to N.Y. Bus. Corp. § 1310. The New York statute thus provides some assistance in interpreting § 14A:13-8. The New York statute is materially identical in authorizing service on the Secretary of State of New York for "any action or special proceeding based upon any liability or obligation incurred by it within this state before the filing of the certificate of surrender." N.Y. Bus. Corp. § 1310(a)(5).

The decisional authority in New York consistently has interpreted the section to presume that it relates to an action brought in the courts of New York, often by a resident of New York, for acts performed while the corporation was registered in New York (even if the acts did not necessarily take place in New York). See e.g., Antonana v. Ore S.S. Corp., 144 F. Supp. 486, 491 (S.D.N.Y. 1956) (suggesting that the statute "indicates that such corporations are not to be permitted, merely by surrendering this license, to escape local processes for enforcement of liabilities previously incurred"); Carlton Properties, Inc. v. 328 Properties, Inc., 143 N.Y.S.2d 140, 142

---

[8] This statute, which was repealed in 2000, spoke of service on the Secretary of State for "any action commenced in any of the courts of this state against a domestic corporation or a foreign corporation authorized to transact business in this state" where the defendant corporation had failed to maintain an office in the state with a designated agent. N.J. Stat. Ann. § 2A:15-26 (emphasis added).

(N.Y. Sup. Ct. 1955) ("I interpret the statute to extend the jurisdiction of our courts to adjudicate controversies involving foreign corporations and citizens of this State, regardless of the situs of the transactions, providing they occurred during the period the corporation was licensed to do business in this State.").

The United States has not identified, and the Court cannot find, any decision which stands for the proposition that either N.J. Stat. Ann. § 14A-13:8 or N.Y. Bus. Corp. § 1310 allows the Secretary of State to be served with a summons that compels an appearance in the courts of another state or federal district. Moreover, and to the contrary, courts have uniformly recognized that the authorization to do business that is required in both states (and that was obtained by Kolon in New Jersey until it withdrew) operates to subject the corporation to "general personal jurisdiction" in the courts of that state. See e.g., Rockefeller Univ. v. Ligand Pharmaceuticals, 581 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) ("[A] filing for authorization to do business in New York is sufficient to subject a foreign corporation to general personal jurisdiction in New York.") (internal quotations omitted); Quigley Co. v. Asbestos Ltd., 35 A.2d 432, 434 (N.J. Ch. 1944) ("Compliance with the statutory condition [to register as a foreign corporation] is not to be construed as defendant's consent to be sued in our court only in

particular causes of action, but as a prerequisite required of it that, for the privilege of coming within our borders and doing business herein, it should submit itself to our courts in all causes of action over which our courts assume jurisdiction.").

In sum, the New Jersey statute on which the United States relies rather plainly intends to enable the courts of New Jersey to assert jurisdiction over a foreign corporation, formerly authorized to do business in that state, for liabilities that it incurred during the period that it was so authorized. The Court can find no warrant for concluding that the statute also allows the United States to serve, through the New Jersey Secretary of State, a criminal summons to appear in a federal court in another district. The purpose and effect of N.J. Stat. Ann. § 14A:13-8 is plainly to expand and maintain the jurisdiction of the courts of the state of New Jersey over corporations that chose to do business there. Assuming, arguendo, that an overt act in furtherance of the conspiracy alleged in this case took place in New Jersey, that statute does not allow the United States to hale Kolon in to this Court.[9]

---

[9] The Court need not reach the question of the effect of N.J. Stat. Ann. § 14A:13-8 on the serving a summons to appear before the United States District Court for the District of New Jersey. Similarly, the Court need not determine, at this stage, the efficacy of service on the Secretary of State of a summons, the date of appearance on which has expired, but is accompanied with

24

## E.    Service on Kolon USA, Inc.

Kolon USA, Inc. ("KUSA") is a wholly owned subsidiary of Kolon Industries, Inc., incorporated under the laws of New Jersey and with its principal place of business in New Jersey. The United States served the indictment and summons in this case on both the president and treasurer of KUSA as well and it mailed a copy of those documents to the KUSA headquarters. Although Kolon disputes that KUSA was served, that argument is unconvincing.[10] In reality, Kolon's objection is that, even if KUSA was served, service on KUSA is not effective service on Kolon and KUSA is not authorized to receive service for Kolon. See Kolon Mot. at 10 ("[E]ven had the Government served the

---

a copy of the Court's order continuing the arraignment.

[10] Kolon raises the question whether service on officers of KUSA, or a mailing to KUSA (which receipt does not indicate who received it), constitutes delivery to KUSA as an organization. See Kolon Reply at 10-11 ("The Government's proposed service through a daisy chain of agents and officers has no support in the text of Rule 4."). This argument is unconvincing. Assuming, arguendo, that KUSA constituted a "general agent" or the alter ego of Kolon, such that service upon KUSA would be sufficient to constitute service upon Kolon, the Court would have to determine what actions must be taken in order to effectuate service on KUSA. The most logical source for that determination would be Fed. R. Crim. P. Rule 4(c)(3)(C) itself, necessitating the conclusion that KUSA would have been served by "delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to received service of process." Id. In perspective of the Court's conclusion, supra, there is no need to decide whether service upon a domestic subsidiary as agent complies with the mailing provision, where the subsidiary had an address in the United States at which to receive mailing, but the parent does not.

summons on an employee of Kolon USA, that service would not have constituted delivery to Kolon.").

As a general proposition, service upon a subsidiary is insufficient to constitute process on the parent. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 334-35 (1925). However, there are two widely recognized exceptions to that rule. The first is a situation in which the subsidiary constitutes the "managing or general agent" of the parent company. See e.g. United States v. Toyota Motor Corp., 561 F. Supp. 354, 361 (C.D. Cal. 1983) (upholding service on the parent by way of service on the subsidiary where it was "the managing agent" of the parent). The second is where the subsidiary serves as the "alter ego" of the parent, such that the subsidiary serves as a "mere conduit for the activities of its parent." United States v. Chitron Elec. Co., 668 F. Supp. 2d 298, 305 (D. Mass. 2009) (quoting Stanley Works v. Globemaster, Inc., 400 F. Supp. 1325, 1332 (D. Mass. 1975)).

Here, the United States argues that KUSA serves as both the "general agent" of Kolon and as its alter ego. Because each test invites a different standard, each must be discussed in turn.

### 1. KUSA as General Agent

Rule 4 plainly provides for delivery to a "managing or general agent" of the organization that is being served. Fed. R. Crim. P. 4(c)(3)(C). Because it involves the interpretation of a

federal rule, "a federal standard controls the question of whether a particular person is a managing or general agent." 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1103 (3d ed. 2002).[11] A line of federal cases has developed analyzing whether a subsidiary constitutes a "managing or general agent" for the purposes of service, at least under the civil rule. Quite to their detriment, these decisions tend to conflate and confuse the agency analysis with the "alter ego" analysis.

For example, in S&S Indus. Inc. v. Nakamura-Tome Precision Indus. Co., 93 F.R.D. 564, 568 (D. Minn. 1982), the court looked for whether the subsidiary served as "a conduit" for the parent

---

[11] The majority of the secondary discussion and decisional authority on the phrase "managing or general agent" arise out of the civil context insofar as Fed. R. Civ. P. 4(h)(1)(B) provides for service on a corporation by "delivering a copy" to, inter alia, "a managing or general agent." Although these discussions do not arise in the criminal context presently before the Court, it is a well-settled principle of statutory construction that similar language used in similar contexts ought to be afforded similar meanings. See e.g., Northcross v. Bd. of Ed. of Memphis City Sch., 412 U.S. 427, 428 (1973) (per curiam) ("The similarity of language in § 718 and § 204(b) is, of course, a strong indication that the two statutes should be interpreted pari passu."); In re Crescent City Estates, LLC, 588 F.3d 822, 829 (4th Cir. 2009) ("[S]imilar language is a strong indication that they are to be interpreted alike."); Hargrave v. Oki Nursery, Inc., 646 F.2d 716, 720 (2d Cir. 1980) ("Use of the same language in various enactments dealing with the same general subject matter . . . is a strong indication that the statutes should be interpreted to mean the same thing."). Accordingly, interpretations of the civil rule are, at least, helpful in determining the application of the criminal rule using the same language.

company. In that case, the court noted that, although the two companies were separate corporations with "distinct financial records and books," there was considerable overlap, so that employees of the subsidiary also performed functions for the parent, and the subsidiary was "formed to handle sales and service operations in this country that had formerly been handled by its parent." Id. Similarly, in Lasky v. Continental Products Corp., 97 F.R.D. 716, 716-17 (E.D. Pa. 1983), the court found, somewhat cursorily, that the plaintiff had failed to demonstrate that the subsidiary "is so dominated and controlled by" the parent to justify finding an agency relationship for the purposes of service.

In In re Hydroxycut Marketing & Sales Practices Lit., 810 F. Supp. 2d 1100, 1115 (S.D. Cal. 2011), the court observed that

> In determining whether a subsidiary acts as an agent of the parent, courts typically look to see whether the parent's control of the subsidiary is so pervasive that the subsidiary can fairly be deemed a means through which the parent acts or an incorporated division of the parent. The control must go beyond the general executive control that a parent normally exercises over a subsidiary; the control must be on the level of day-to-day operational controls.

The court went on to survey the law of various states regarding control by a parent company. Id. at 1116-17 (discussing the law of Delaware, New Jersey, and New York); see also id. at 1115 n.6

(collecting cases from California, Georgia, Tennessee, Canada, Texas, and other federal courts). The key factor for the Hyrdoxycut court was the degree of control that the parent company had over the day-to-day operations of the subsidiary. Id. at 1121.

The foregoing decisions are unhelpful because the issues of day-to-day control, shared employees, domination and control, and so forth are not truly questions of agency.[12] Instead they properly are considered in assessing whether the subsidiary serves as the "alter ego" of the parent. The only decision relied upon that squarely frames the analysis as one of agency is United States v. Toyota Motor Corp., 561 F. Supp. 354 (C.D. Cal. 1983) where the court found that service on the subsidiary was sufficient because the subsidiary had "full marketing responsibility for sales of [the parent company's] products in the United States." Id. at 361. However, this observation was offered without any real analysis.

Thus, as we must, we "begin at the beginning and go on until [we] come to the end: then stop."[13] The question whether

---

[12] Control by a principal over the agent is a component of agency, but the pervasive control of which the cited decisions speak is not required to make a finding of agency and is a more central component of the alter ego analysis.

[13] Lewis Carroll, Alice's Adventures in Wonderland 142 (Edmund Brown ed., 1939).

KUSA serves as Kolon's "general agent" presents two distinct questions: is it an agent at all and, if so, is it a general or special agent?[14]

Generally speaking, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006). "Agency is never to be presumed; it must be shown affirmatively." <u>Karl Rove & Co. v.</u>

---

[14] Fed. R. Crim. P. 4(c)(3)(C) provides for service on a "managing or general agent" and both parties regularly use both terms in their papers. A "managing agent" is an ill-defined concept that appears to be invoked principally in the civil discovery context. See Fed. R. Civ. P. 30(b)(6) (An organization named in a subpoena must "designate one or more officers, directors, or <u>managing agents</u>, or designate other persons who consent to testify on its behalf") (emphasis added). Whether a party constitutes a "managing agent" depends on a number of factors, including whether the party can "exercise judgment and discretion in corporate matters." <u>Sugarhill Records Ltd v. Motown Record Corp.</u>, 105 F.R.D. 166, 170 (S.D.N.Y. 1985). In the discovery context, the term "managing agent" appears to denote some measure of significant involvement in the affairs of a corporation, or of the parts of it, on whose behalf, or about which, the agent is testifying. This requirement is entirely inconsistent with the position of the United States here, which is that Kolon exercises substantial control over KUSA and not the reverse. Accordingly, KUSA cannot be considered the "managing agent" of Kolon. Further, most of the courts that have considered the language "managing or general agent" in the context of service of process have conflated the two types of agency and applied a standard that would properly be considered a standard of general agency. However, to the extent that the terms are synonymous, only one need be considered because the United States takes the view that KUSA is a general agent for Kolon.

_Thornburgh_, 39 F.3d 1273, 1296 (5th Cir. 1994). In most cases, "the existence and scope of agency relationships are factual matters." _Metco Prod. Inc. v. Nat'l Labor Relations Bd._, 884 F.2d 156, 159 (4th Cir. 1989). "To prove an agency relationship by implication, there must be factual evidence in the record supporting the implication that the putative agent acted as such. A mere proclamation of agency is insufficient." _Integrated Consulting Serv., Inc. v. LDDS Commuc'ns, Inc._, 996 F. Supp. 470, 475 (D. Md. 1998).

An agency relationship can be actual or apparent. Actual agency "exists when, at the time of taking action that has legal consequences for the principal, the agent reasonably believed in accordance the principal's manifestations to the agent, that the principal wishes the agent so to act." _Ashland Facility Operations, LLC v. Nat'l Labor Relations Bd._, 701 F.3d 983, 990 (4th Cir. 2012) (quoting Restatement (Third) of Agency § 2.01 (2006)). Apparent authority arises where a third party reasonably believes that the putative agent has the authority to bind the principal. _See_ Restatement (Third) of Agency § 2.03 (2006). The mark of an agent is the ability, whether actual or apparent, to contract in the name of the principal and thereby bind him. _See_ _Taylor v. Mayo_, 110 U.S. 330, 334-35 (1884) ("An agent represents and acts for his principal, who may be either a natural or artificial person. . . . When an agent contracts in

the name of his principal, the principal contracts, and is bound, but the agent is not."); see also Chien v. Commonwealth Biotechnologies, Inc., 484 B.R. 659, 666 (E.D. Va. 2012) ("[A] principal can grant authority to an agent and [ ] the agent may or may not be able bind the principal in dealings with a third party, depending on what the third party knew, or should have known, at the time of the interaction.").

Once an agent-principal relationship is established, the question becomes the scope of the agency: whether it is "general" or "special." In the modern federal context, that distinction is most commonly drawn in the admiralty context, specifically in reference to maritime liens,[15] which, while not entirely on point, is nonetheless informative. For example, the United States Court of Appeals for the Fourth Circuit explained,

---

[15] A maritime lien is:

> A privileged claim upon maritime property, such as a vessel, arising out of services rendered to or injuries caused by that property. The lien . . . adheres to the maritime property even through changes of ownership until it is either executed through the in rem legal process available in admiralty or is somehow extinguished by operation of law.

1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 9-1 (5th ed. 2002). The distinction between a general and special agent matters in this context as a general agent of the owner cannot create a maritime lien because the general agent is deemed to be "in a position to control the vessel's destiny" and can bind the owner of the vessel. Id.

in addressing whether an agent could bind the owner of the ship or the ship itself,

> The parties do not dispute, and we agree, that as a general proposition of law a general agent of a ship, as distinguished from a special agent, is not permitted to assert a maritime lien against the ship except in those rare instances where the general agent by express agreement with the owner is given a lien on the vessel, or there are present such circumstances as to imply such an agreement. The rationale of the rule is that a general agent is so closely related to the owner that he is presumed to have made advances on the credit of the owner rather than that of the ship. Conversely, a special agent, having no close ties or relationship to the owner, is presumed to make advances on the credit of the ship.

Ameejee Valleejee and Sons v. M/V Victoria U., 661 F.2d 310, 312 (4th Cir. 1981). The court explained:

> Notwithstanding the emphasis on continuity of service contained in [another case], we think that the more important factor in the determination of whether agents are general or special is the degree of authority which the owners have delegated to them. Although continuity of service is a factor to be considered, we think that one may be a general agent for a single transaction involving a ship; and, conversely, one may be a special agent over a period of years involving numerous transactions. To repeat, the more important factor is the scope of the agent's authority. If the delegated authority is substantial, the agents are general agents; but if the authority is limited to getting a vessel in and out of a particular port, the agents are special agents and may assert maritime liens.

Id. at 313. Although the distinction between a special and general agent in the context of a maritime lien is directed towards a different end, the distinction, and thus the analysis, is rather similar to the present context. As one court noted, "[t]he distinction between general and special agents relates to scope of authority, and not to the maritime or nonmaritime nature of the underlying contract." Standard Marine Bunkering Services, Inc. v. Landmark Union Ltd., 686 F. Supp. 905, 911 n.2 (S.D. Ga. 1987).

In truth, the clearest summary of the distinction between a special and general agency can be found in an otherwise antiquated decision of the United States Supreme Court. The Court explained:

> The distinction between a general and a special agency is in most cases a plain one. The purpose of the latter is a single transaction, or a transaction with designated persons. It does not leave to the agent any discretion as to the persons with whom he may contract for the principal, if he be empowered to make more than one contract. Authority to buy for a principal a single article of merchandise by one contract, or to buy several articles from a person named, is a special agency, but authority to make purchases from any persons with whom the agent may choose to deal, or to make an indefinite number of purchases, is a general agency. And it is not the less a general agency because it does not extend over the whole business of the principal. A man may have many general agents-one to buy cotton, another to buy wheat, and another to buy horses. So he may have a general agent

> to buy cotton in one neighborhood, and
> another general agent to buy cotton in
> another neighborhood. The distinction
> between the two kinds of agencies is that
> the one is created by power given to do acts
> of a class, and the other by power given to
> do individual acts only. <u>Whether, therefore,
> an agency is general or special is wholly
> independent of the question whether the
> power to act within the scope of the
> authority given is unrestricted, or whether
> it is restrained by instructions or
> conditions imposed by the principal relative
> to the mode of its exercise</u>.

<u>Butler v. Maples</u>, 76 U.S. 766, 773-74 (1869) (emphasis added).

Examining the facts in that record, the Supreme Court concluded

that the agreement between the principal and agent created a

general agency, finding that:

> It was a delegation of authority to buy
> cotton in Desha County and its vicinity, to
> buy generally, from whomsoever the agent,
> not his principals, might determine. It had
> in view not merely a single transaction, or
> a number of specified transactions, which
> were in the mind of the principals when the
> agent was appointed, but a class of
> purchases, a department of business. It is
> true that it contained guards and
> restrictions which were intended as
> regulations between the parties, but they
> were secret instructions rather than
> limitations. They were not intended to be
> communicated to the parties with whom the
> agent should deal, and they never were
> communicated.

<u>Id.</u> at 774. These were the hallmarks of a general agency.

Here, the United States rests its claim to agency on a

fairly limited number of facts that are presently before the

Court.[16] For one, the United States contends that KUSA was "formed for the distribution of Kolon Industries' products." Govt. Opp. at 19. In addition, the United States attaches the 2011 testimony before the International Trade Commission of Bruce Lee, who is identified as the General Manager of KUSA's Marketing and Sales Team, in which he describes KUSA as the "U.S. sales subsidiary of Kolon Industries" and that KUSA's "business is selling Kolon merchandise." Govt. Opp. Ex. F (Docket No. 25-6) at 7. The United States also relies on the deposition of Jong Sik Yang, who is the president of KUSA, emphasizing the near complete ownership of KUSA by Kolon Industries; the fact that Mr. Yang worked for Kolon for 20 years

_____

[16] At the hearing on this motion, the Court raised the question of whether the United States wanted it to go through the docket in E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc., Civ. A. No. 3:09cv058, over which the Court presided, and "root through the docket and see what it is that I think may be helpful to your cause." (Tr. at 89:8-10). Counsel for the United States responded that the United States would prefer "the Court to rule on the facts we have before the Court." (Tr. at 89:20-21). Accordingly, for the purposes of this motion, the Court must make the agency determination on the basis of the factual assertions made and supported in the papers on the motions.

Kolon has raised a number of evidentiary objections relating to assertions made by the United States in its papers and its exhibits. See Kolon Reply Ex. C (Docket No. 28-3); Kolon Supp. Br. Ex. 1 (Docket No. 39-1). The Court need not resolve these objections at this time, since the exhibits on which the parties principally rely in support and opposition of the claim of agency, namely the deposition testimony of Jong Sik Yang, attached as Exhibit G to the United States' opposition (Docket No. 25-7), and the declaration of Sung Gu Hong, attached as Exhibit C to Kolon's Motion (Docket No. 21-3), were not objected to.

36

before becoming president of KUSA; and the overlap between the
boards of directors of the two companies. Govt. Opp. at 20. Mr.
Yang also testified that KUSA sells a number of Kolon products,
See (Tr. of Yang Deposition ("Yang Dep.") (Docket No. 25-7) at
56:12-57:11). The United States asserts that KUSA also
advertises Kolon products that KUSA does not sell. Govt. Opp. at
20.[17] It is clear, however, that KUSA sells exclusively products
that are manufactured by Kolon or by PT Kolon Ina, a corporation
in which Kolon is a majority shareholder. (Yang Dep. at 62:20-
63:6).[18] Kolon and KUSA also coordinated the decision to open
KUSA's Atlanta office, which conducts market research for

---

[17] During his deposition, Mr. Yang was asked about a number of
Kolon products that appear on KUSA's website but that KUSA does
not sell. Mr. Yang explained that the products were being
"marketed or research for the marketing purpose" in order to
"pioneer the future market for K-USA and to grow as a company."
(Yang Dep. at 61:18-24). Mr. Yang made it clear that the
products were "a prospective future product that K-USA will
sell, not currently, but future." (Id. at 60:12-14). Mr. Yang
clearly stated that it was "not correct" that KUSA was
advertising on behalf of Kolon. Id. at 60:11-12. The most
logical interpretation of Mr. Yang's responses is that KUSA
lists some products on its website that it does not sell in
order to gauge interest in those products amongst KUSA's
customers before determining whether to sell them. Mr. Yang is
very clear that, by listing the products, KUSA is not simply
acting as a sales representative for Kolon.

[18] PT Kolon INA is an Indonesian corporation that, according to
the exhibit prepared regarding the Kolon restructuring in the
related civil case, is a Kolon subsidiary of which Kolon owns
78% of the shares. See Exhibit 2 to the Court's Memorandum
Opinion, Docket No. 2136-2, E.I. DuPont de Nemours & Co. v.
Kolon Indus., Inc., Civ. A. No. 3:09cv058 (E.D. Va. Oct. 5,
2012).

Kolon's products not previously sold by KUSA and tracks Kolon's customers in the United States. Govt. Opp. at 20-21. Mr. Yang also testified that "most of the time" the products sold by KUSA to its United States customers are shipped to the KUSA storage facility in New Jersey, however, when there needs to be an "emergency delivery" or "urgent delivery," there are times when shipments are made directly from Kolon to the customer. (Yang Dep. at 69:14-70:12).

In response, Kolon relies, principally, on a declaration from Sung Gu Hong, who is the treasurer of KUSA. Declaration of Sung Gu Hong ("Hong Decl."), Kolon Mot. Ex. C (Docket No. 21-3). Mr. Hong explains that KUSA is a New Jersey corporation, incorporated in 1986, and is a "separate legal entity from Kolon Industries, Inc." Hong Decl. ¶ 4. KUSA "is mainly engaged in the business of importing (purchasing) and sales of nylon and polyester films." Id. at ¶ 5. According to Mr. Hong, KUSA "is independently responsible for its marketing and operational policies, including purchasing, warehousing, marketing setting prices, and all sales of its merchandise." Id. KUSA is responsible for seeking out and maintaining relationships with customers in the United States and Canada. Id. at ¶ 6. According to Mr. Hong, although KUSA provides Kolon with updates "regarding its business performance," it manages its operations independently and files financial statements separately from

Kolon. Id. at ¶ 7-9. Most importantly, Mr. Hong stresses that KUSA "personnel are authorized to enter into contracts and other agreements only on behalf of Kolon USA." Id. at ¶ 10.

"The party who asserts the existence of [an] agency relationship has the burden of proving it." Thornburgh, 39 F.3d at 1296. The threshold question, then, is whether the United States has presented sufficient facts to conclude that KUSA had authority (or acted as if it had authority) to take actions with "legal consequences for the principal." Restatement (Third) of Agency § 2.01 (2006). The United States has not made such a showing here on the present record. The evidence before the Court indicates that, while KUSA engaged in the sales of Kolon products to American and Canadian customers, it did so by binding itself, and not Kolon, to contracts. KUSA then purchased the products from Kolon, imported them to its warehouse in New Jersey, and then distributed them to KUSA's customers.[19] Although both Kolon and the United States focus on issues such as ownership of the corporations, shared directors, the maintenance of corporate formalities, those are factors better suited to the

_____

[19] The record appears to be silent on whether KUSA kept a surplus of Kolon products in its New Jersey warehouse and then sold them (in effect, acting as a reseller of Kolon productions) or if KUSA ordered products from Kolon on an as-needed basis, storing them in New Jersey only for the time needed to comply with customs formalities and resend them to the end user. Mr. Yang did testify that KUSA stores approximately one thousand tons of product in the United States. (Yang Dep. at 69:8).

alter ego analysis. In sum, on this record, the United States has failed to meet its burden of demonstrating that KUSA is the general agent of Kolon. Accordingly, service on KUSA is not sufficient under a "managing or general agent" theory.

### 2. KUSA as Alter Ego

The parties agree that service on a subsidiary would be appropriate if the subsidiary constituted the "alter ego" of the parent corporation. Compare Govt. Opp. at 21, with Kolon Mot. at 11. They disagree, however, on what law to apply to the analysis. Kolon argues that Korean law governs the alter ego analysis on the basis that "Kolon is incorporated in Korea; hence, Korean law should apply." Kolon Supp. Br. at 9. The United States suggests that the law is muddled by citing to cases that apply a generic federal standard, see e.g., United States v. Public Warehousing Co., No. 1:09-cr-490, 2011 WL 1126333 at *5 (N.D. Ga. March 28, 2011) (applying the "Eleventh Circuit" test), cases that apply the law of the forum state, see e.g., Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423 (4th Cir. 2011), and the law of the state of incorporation, see e.g., United States v. Castellano, 349 F.3d 483, 87 (7th Cir. 2003).[20]

---

[20] The United States contends that a federal standard should apply in federal criminal cases because the case will "often take place outside of the home jurisdiction of either the parent or subsidiary." That position is not well-taken. Govt. Resp. at

Kolon provides limited support for the proposition that the law of the parent corporation should govern the alter ego analysis and the Court finds this argument unavailing.[21] As a general proposition, "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation." First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983); see also Restatement (Second) of Conflict of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability . . . to its

---

22 n.6. The Court agrees that "adjudication of alter ego issues should not turn on the happenstance of the district court's geographic location." Id. Rather than auger in favor of a circuit-specific federal standard, that factor suggests the value of a standard that, instead, turns on the citizenship of the corporation in question. Federal district courts are regularly called upon to apply state law, both that of the forum state and of other states, and are perfectly capable of doing so.

[21] Kolon cites to several cases in support. For example, it cites Davaco, Inc. v. AZ3, Inc., No. 3:07-cv-803, 2008 WL 2243382 (N.D. Tex. May 30, 2008) in which the court accepted the defendant's claim that Quebec law governed the veil-piercing analysis and dismissed the action because the plaintiff failed to respond to that argument. In Davaco, however, both the parent and the subsidiary were Quebecois corporations. Id. Similarly, Kolon relies on Mega Tech Intern. Corp. v. Al-Saghyir Establishment, No. 96-civ-8711, 1999 WL 269896 (S.D.N.Y. May 3, 1999) which applied Saudi Arabian law to a veil-piercing analysis between two corporations which were both incorporated in Saudi Arabia. While these cases provide support for the proposition that the law of the state of some entities' incorporation governs, they do not help address the issue here where the parent and the subsidiary are incorporated in different jurisdictions.

creitors for corporate debts.").

The issue here, of course, is <u>whose</u> state of incorporation governs: that of Kolon or that of KUSA? The "alter ego" doctrine provides for the imputation of a corporation's actions to its shareholders and an extension of the liability of those actions to the same. For this reason, a finding of "alter ego" status is also referred to as "piercing the corporate veil." As a conceptual matter, the "veil-piercing" analysis requires the Court to find that a corporation and its shareholders have so misused or disregarded the corporate form, that it would be appropriate to strike through the general liability shield and get at the shareholders. Here, despite the fact that the entities at issue are both corporations, the same basic formulation applies, with Kolon playing the part of "shareholder," and KUSA in the role of "corporation." For the foregoing reasons, it is the law of the state of KUSA's incorporation, viz., New Jersey, that governs the alter ego analysis.[22]

_____

[22] The parties agree that the veil piercing analysis under Virginia law is substantially similar to the analysis under New Jersey law. <u>See</u> Kolon Supp. Br. at 12; Govt. Supp. Br. at 7. Because the Republic of Korea is a civil law country, it has not developed the same degree of decisional authority relating to the piercing of the corporate veil as a common law country would. Sun Bae Kim, <u>A Comparison of the Doctrine of Piercing the Corporate Veil in the United States and South Korea</u>, 3 Tulsa J. Comp. & Int'l L. 73, 93 (1995) ("In contrast to the United States, where the courts have applied piercing the corporate

The Supreme Court of New Jersey has provided some guidance as to the proper analysis under New Jersey law, taking the view that the corporate veil may be pierced upon a finding that the subsidiary "was a mere instrumentality of the parent corporation." Dep't of Envtl. Prot. v. Ventron Corp., 468 A.2d 150, 164 (N.J. 1983) (quoting Mueller v. Seaboard Commercial Corp., 73 A.2d 905, 908 (N.J. 1950)). The court went on to explain that, "even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Ventron, 468 A.2d at 164. The court also reaffirmed the principle that, "even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated." Id. Although in Ventron, the court ultimately found that piercing the corporate veil was appropriate as a matter of statutory law, the Third Circuit has noted that the decision is still "indicative of that court's requirements for piercing the corporate veil . . ." under the common law. Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 151 n.4 (3rd

---

veil doctrine in many cases, South Korea, as a civil law country, has established relevant statutes for such cases, and, therefore, ambiguous situations occur less often in South Korea."). However, it appears that piercing the corporate veil, under Korean law, is limited to situations in which observing the corporate form would lead to "an unexpected, unwanted injustice and inequity." Id. at 86.

Cir. 1988), observing that "*Ventron* continues New Jersey's long tradition of requiring domination before the corporate veil will be pierced." Id. (also collecting cases). Indeed, the standard under New Jersey appears consistently to have been quite stringent. See e.g., Telis v. Telis, 26 A.2d 249, 251 (N.J. 1942) (piercing where "the corporate creation was, and its existence is, a mere sham, a mere subterfuge, a mere instrumentality employed for concealing the truth and, therefore, in the equitable sense, fraudulent"); Kugler v. Koscot Interplanetary, Inc., 293 A.2d 682, 73 (N.J. Super. Ct. Ch. Div. 1972) (piercing appropriate where "the corporate form is used by individuals for the purpose of evading the law, or for the perpetuation of fraud"). The most recent New Jersey Supreme Court decision on the alter ego determination that the Court was able to find continued to apply the Ventron analysis. Shotmeyer v. New Jersey Realty Title Ins. Co., 948 A.2d 600, 608 (N.J. 2008) (quoting Ventron, 468 A.2d at 150, for the prososition that a court should pierce the corporate veil to prevent the corporate form from being "used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law").

In support of the contention that KUSA constitutes the alter ego of Kolon, the United States relies on many of the same factors on which it based its claim that KUSA was the general

agent of Kolon. See generally Govt. Resp. at 20-21. As noted above, most of these factors are more appropriate to an alter ego analysis than to an agency analysis. The United States bases its alter ego argument on the virtually complete ownership of KUSA by Kolon, the overlap in board members between the two corporations, the fact that KUSA tracks Kolon's customers, and the fact that Kolon acts as a guarantor for KUSA's lines of credit. Govt. Resp. at 21.

The United States also draws the Court's attention to a payment scheme set up between Kolon and KUSA in which KUSA demanded payments from its clients on 30 or 60 day terms, but was not required to make payments to Kolon for 150 days, (Yang Dep. at 150:5-13), arguing that this plan was changed to require KUSA to prepay for goods, allegedly in an effort to frustrate the ability of a judgment creditor to garnish Kolon's accounts receivable. See Govt. Sur-Reply at 9-10. Kolon responds that "a judgment debtor is not precluded from continuing to do business with customers or from organizing its transactions in such a manner that enables it to maintain solvency." Kolon Reply at 16.

Kolon also identifies several facts, also elicited during the Yang deposition, that it believes undermines the claim of the United States that KUSA constitutes an "alter ego" of Kolon. For example, according to Mr. Yang, KUSA negotiates with Kolon over the prices it pays Kolon, as well as over the price at

which KUSA resells the products. (Yang. Dep. 117:15-25). KUSA's books are audited by an outside company (Deloitte) and are not audited by Kolon. (Yang Dep. 119:10-16). Kolon also notes, and the United States at oral argument conceded, that KUSA and Kolon maintain corporate formalities. See Kolon Reply at 15; Tr. at 83:1-4. Indeed, at argument, the United States conceded that "this is not a case . . . where there's intermingled books or intermingled assets. (Tr. at 83:7-9).

It is well-settled that "mere ownership of a subsidiary does not justify the imposition of liability on the parent." Verni ex rel. Burstein v. Harry M. Stevens, Inc., 903 A.2d 475, 497 (N.J. Super. Ct. App. Div. 2006) (quoting Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3rd Cir. 2001)). Under New Jersey law, and under most analyses of the subject, the Court must engage in a fact-specific determination "considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a façade." Verni, 903 A.2d at 498.

The United States has presented hardly any evidence that would be sufficient to support such a finding. By all accounts, Kolon and KUSA maintain formalities. Based on the current record, KUSA is solvent, maintains records which are

46

independently audited, negotiates with and pays Kolon for the products that it purchases from it. There is no evidence regarding KUSA's capitalization. KUSA's officers report to its own board of directors and not to Kolon's. See (Yang Dep. 93:10-11). Although the overlap in the board of directors is probative of the existence of control by the parent corporation, it is settled that alter ego status "cannot be established by overlapping boards of directors" alone. Seltzer v. I.C. Optics, Ltd., 339 F. Supp. 2d 601, 610 (D.N.J. 2004); see also Leo v. Kerr-McGee, No. 93-1107, 1996 WL 254054 at *6 (D.N.J. May 10, 1996) ("A significant degree of overlap between directors and officers of a parent and its subsidiary does not establish an alter ego relationship."); Intelnet Intern. Corp. v. ITT Corp., 2006 WL 2192030 at *13 (N.J. Super. Ct. App. Div. Aug. 4, 2006) ("Under New Jersey law, overlap of directors and officers of a parent and its subsidiary, even to a significant degree, does not establish an alter ego relationship for liability purposes."). Indeed, in Ventron, the court rejected alter ego status under New Jersey law despite finding that the parent corporation's "personnel, directors and officers were constantly involved in the day-to-day business" of the subsidiary. Ventron, 468 A.2d at 165. The court found that those facts "by themselves" were "not sufficient to support the further conclusion that the intrusion of [the parent] into [the

subsidiary's] affairs reached the point of dominance." Id.

On this record, the United States has failed to present enough evidence to support a finding that Kolon "dominated" KUSA or that KUSA "was merely a conduit for the parent." See id. at 164. At best, the United States has alleged that KUSA played a role in the criminal conspiracy alleged here (a claim Kolon hotly contests) or that KUSA and Kolon were complicit in attempting to avoid collection of Kolon's judgment debt in the civil suit; but, even if true, such claims are not sufficient to establish alter ego status. On this record then, service on Kolon cannot be sustained on the alter ego theory.[23]

## F.   Service Pursuant to the MLAT

The United States also attempted to effectuate service pursuant to the Mutual Legal Assistance Treaty ("MLAT") between the United States and the Republic of Korea ("South Korea"). The treaty provides for delivery of summons in South Korea at the request of the United States, after a number of procedural hurdles are overcome.

Kolon argues that service under the MLAT is inherently

---

[23] In criminal alter ego cases, the Court can consider, in assessing whether that burden has been met, the allegations of the indictment and affidavits. See Chitron, 668 F. Supp. 2d at 303; see also Pangang, 879 F. Supp. 2d at 1057-64 (relying on affidavits and declarations). That is permissible in criminal cases because there is no discovery at this stage of a criminal case.  And, of course, the allegations of an indictment must be supported by evidence offered to the grand jury and any evidence presented to the grand jury can be considered, as well.

deficient. Kolon first suggests that the MLAT cannot act as a superior (or alternative) method for service of process, invoking Article I, Section 8 of the United States Constitution. See Kolon Reply at 7. According to Kolon, "the territorial jurisdiction of federal court process" is an area specifically reserved to the Congress and cannot be usurped by the Executive through his treaty making powers. Id.

The United States responds to this argument by noting that service of process is an issue of personal jurisdiction, not subject-matter jurisdiction, which arises out of the Due Process clause and not from Article III (or Article I). Gov't. Sur-Reply at 4. As the United States notes, "[t]he requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). Thus Article I, Section 8 does not present a bar to use of the MLAT as a vehicle to serve a summons.

Kolon's next argument begins with the text of Rule 9 which provides that a summons pursuant to an indictment "must be . . . served as provided in Rule 4(c)(1), (2), and (3)." Fed. R. Crim. P. 9(c)(1)(A). And, says Kolon, a plain reading of Rule

4 requires that service must be effectuated in the United States. See Kolon Reply at 6 ("Under the plain language of this Rule, a summons cannot be served outside the United States."). Accordingly, says Kolon, because Rule 9 is plainly mandatory, failure (even if as result of inability) to comply with Rule 4 by not serving within the United States means that service was not effectuated. Kolon Reply at 6-7.

As Kolon argues, Rule 4(c)(2) does impose limitations and requirements on the ability of government employees to serve process and to effectuate arrests; however, the Rule is silent about how the United States can effect service of process abroad. That, of course, makes common sense because service of process in a foreign country implicates different issues than do the rules of criminal procedure. It then is quite logical that service abroad is not mentioned in Rule 4. But, that silence cannot be construed as a prohibition against serving a summons overseas. Rather, it bespeaks that service abroad is dealt with elsewhere. In this instance, that topic is addressed in treaties regulating this nation's relations with other nations.

Thus, even though the criminal rules do appear to prevent agents of the United States, such as the United States Marshals Service, from serving the summons outside of their territorial

jurisdiction, Fed. R. Crim. P. 4(c)(2),[24] the Court concludes that the Rule is silent as to use of foreign authorities to effectuate service abroad, and that service in South Korea is governed by the MLAT between the United States and South Korea.

In this case, however, service under the MLAT was not effectuated until two days after the date for appearance specified in the summons. The United States argues that the tardy service is immaterial, construing the Court's order continuing the arraignment until March 6, 2013 as an amendment to the summons. See Govt. Supp. Br. at 2 (contending that "service of the original summons and the order is materially the same as service of a summons featuring the March 6, 2013 arraignment date"). Whatever the merits of that position, it is simply the case that the Court's order has not been served on Kolon under the MLAT. See (Tr. at 59:4-9) (THE COURT: "Did you use the MLAT to serve that order?" MR. STOJILKOVIC: "We submitted it under the MLAT. And . . . it has not gotten there

---

[24] The advisory committee notes state that Rule 4(c)(2) is intended to "state[] the traditional rule recognizing the territorial limits for executing warrants." Fed. R. Crim. P. 4 advisory committee's note to 2002 amendments (emphasis added). The note suggests that the rule is not intended to apply to the service of summons. That further supports the view that the United States can turn to alternative means, such as treaties if they so permit, to serve a summons on a foreign individual or organization.

despite our timely submission.").[25] Rule 4 suggests, and common sense confirms, that, to effectively compel appearance on a specific date, the summons must be delivered before the appearance date listed thereon. For example, the Rule requires that the "person to whom a summons was delivered for service must return it on or before the return day." Fed. R. Crim. P. 4(c)(4)(B).[26] Considering the penalty for failure to obey a summons, due process would also seem to require that a summons must be served before the date on which an appearance is commanded in order to have effect. The question, then, is whether tardy service under the MLAT, when coupled with actual notice, constitutes sufficient service of process.[27]

---

[25] Insofar as the United States has not served the Court's order on Kolon, the Court need not reach the question of whether the order continuing the arraignment, if served with the original summons, collectively constitute a valid summons under Fed. R. Crim. P. 4(b)(1)(A)-(C) & (b)(2).

[26] Here, for reasons neither explained nor readily apparent, the United States has not filed a return at all. Kolon noted this in its initial motion. Kolon Mot. at 6 (noting that "the Government never filed a return of service"). However, Kolon has not pressed this particular argument in its papers or at argument. Further, under the circumstances, the Court need not reach the question of whether this technical violation invalidates service.

[27] There is no question that actual notice is insufficient to constitute service by itself. See e.g., Nat'l Dev. Co. v. Triad Holding Corp., 930 F.2d 253, 256 (2d Cir. 1991) ("We reject the notion that "actual notice" suffices to cure a void service."); Benny v. Pipes, 799 F.2d 489, 492 (9th Cir. 1989) ("[N]either actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without substantial

The United States suggests that "[c]ivil case law supports the proposition that defects in service of process can be remedied by providing notice to the defendant without resort to additional service of process," Govt. Supp. Br. at 2, relying principally on Sanderford v. Prudential Ins. Co., 902 F.2d 897 (11th Cir. 1990). In Sanderford, the defendant had been served with a summons that contained the standard language directing the defendant to answer "within ___ days after service . . ." Id. at 899. However, the number of days had been omitted from the summons. Id. It was undisputed that the defendant "had notice of the action against him from the very beginning" and that he was subsequently served "with numerous motions all relating to default judgment;" which was ultimately entered against him. Id.

On appeal, the defendant alleged that he had never been subject to the jurisdiction of the court insofar as he had not been properly served with the summons. Id. The Eleventh Circuit

---

compliance with [civil] Rule 4.") (internal quotation omitted); Way v. Mueller Brass Co., 840 F.2d 303, 306 (5th Cir. 1988) ("The defendant's actual notice of the litigation, moreover, is insufficient to satisfy [civil] Rule 4's requirements."); Grezeskowiak v. Dakota Bridge Builders, 241 F. Supp. 2d 1062, 1064 (D.N.D. 2003) ("If actual notice could substitute for proper service of process, it would be nonsensical for the Federal Rules of Civil Procedure to provide for a motion to dismiss based on insufficiency of service of process, because no such motion could be filed without actual notice of the lawsuit.") (internal citation omitted).

identified that case as not being one of "personal jurisdiction . . . rather we believe that this case turns on waiver of the defense of insufficiency of process." Id. at 900. That court ultimately concluded that the defendant had waived the defense because the summons was "in substantial compliance" with the Rule and because "the only information omitted from the summons was the return date for the responsive pleading [which was] readily ascertainable from the Federal Rule." Id. at 900. As a result, the defendant had to either raise the defense under Fed. R. Civ. P. 12 or make a showing that the defect had caused him some prejudice. Id. at 901.

As Kolon notes, Sanderford is fundamentally a decision about wavier, rather than about the merits of the defense. That is not the situation here, where Kolon promptly and vigorously asserted its defense by specially-appearing to challenge the summons. See Kolon Supp. Br. at 7 (noting that the Sanderford defendant "sat idly by" where Kolon "asserted its defense of insufficiency of service at the earliest available opportunity").

However, Sanderford in inapposite to this case for an even more fundamental reason. Sanderford presented the question whether the court could assert jurisdiction over a defendant "who was properly served with a timely, albeit defective summons." 902 F.2d at 898. In this case, however, the summons on

Kolon is defective precisely because it was not timely served. Kolon does not claim that the summons was defective, so much that it expired when it was not served in a timely manner. See Kolon Supp. Br. at 6 n.8 (asserting that the summons "expires if it is not served prior to the date of the scheduled appearance").

The Fourth Circuit decisions on which the United States relies are similarly off point. In United States v. A.H. Fischer Lumber Co., 162 F.2d 872 (4th Cir. 1947), the Court of Appeals addressed a situation in which the summons had identified the defendant as "A.H. Fischer Lumber Company" and later as "A.H. Fischer Company, Inc." although the defendant was properly named the "A.H. Fischer Company." Although the summons had been served on the proper defendant, "there was no other corporation in the locality with a similar name, and nobody was misled in the first case by including the word 'Lumber' in the corporate name of the defendant in the summons and complaint," the district court did not allow the plaintiff to amend the summons and dismissed the complaint. Id. at 873. The Court of Appeals reversed, finding that, "[even] without amendment the process in both cases adequately named the defendant and was sufficient to bring it into court" Id. The court found that the amendment should have been permitted and the case allowed to proceed.

In Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218

(4th Cir. 1999), the Fourth Circuit addressed the argument that a summons was defective where it identified the defendant as "The Miller Group Construction Company" rather than as "The Miller Group Construction Company, Inc." The court observed that "there is simply no possibility that . . . the president of the insured corporation who accepted service on its behalf did not understand" that the summons was intended for that corporation. Id. at 224. Relying on other cases that rejected the "technical misnaming" of a defendant as a basis for disputing service, the court affirmed the principle that, absent some confusion, exclusion of an unnecessary "Inc." was not fatal to the summons. Id. at 224-25.

Kolon seeks to distinguish these cases by emphasizing the triviality of the inappropriate inclusion or exclusion of the suffix "Inc." Kolon Supp. Br. at 7. This however misses a more basic point: the summons here, in contrast to the summonses in Morrel and A.H. Fischer, was not defective. It fully complied with the requirements set forth in Rule 4(b)(2). The summons was only inaccurate because it was not served in a timely manner. It is a canard to suggest that the defect arose out of its creation rather than its delivery.

The parties do not cite, and the Court cannot find, any decisional authority that addresses the effect of a summons served after the appearance date specified thereon. Nonetheless,

the requirement of Rule 4(c) that a summons set out a date and time for the defendant to appear, taken together with the requirement of Fed. R. Crim. P. 4(c)(4)(B) that the summons be returned "on or before" the return date, as well as "traditional notions of fair play and substantial justice,"[28] auger in favor of a conclusion that a summons has no effect if it is served subsequent to the date on which the defendant is commanded to appear. See also Fed. R. Civ. P. 45(c)(3)(A)(i) (court must quash a subpoena that "fails to allow a reasonable time to comply"). Accordingly, the Court concludes that the United States failed to effectuate service pursuant to the MLAT.

## G. Dismissal of the Indictment

Unlike the parallel civil rule, the federal criminal rules do not provide any time limit in which a summons must be served. Compare Fed. R. Crim. P. 4, with F. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is file, the court . . . must dismiss the action."). The sole basis upon which Kolon asks the court to dismiss the indictment is its position that Fed. R. Crim. P. 4(c)(3)(C) effectively prevents the government from ever being able to serve Kolon with the summons in this action, as Kolon does not have a mailing address in the United States. Having rejected the claim that the mailing provision is a jurisdictional requirement and further

---

[28] Miliken v. Meyer, 311 U.S. 457, 463 (1940).

recognizing that, if the United States were able to present sufficient facts to support a finding that KUSA constitutes Kolon's "alter ego," mailing the summons to that organization would comply with Rule 4's requirements, the Court cannot conclude to any degree of certainty that the United States will not be able to serve Kolon in this case. Moreover, the United States likely will be able to serve Kolon under the MLAT. Accordingly, to the extent that it seeks dismissal of the indictment, the motion is denied. See Dotcom, 2012 WL 4788433 at *1 (denying a motion to dismiss the indictment where the court could not "find to a legal and factual certainty that the United States will be unable to serve the corporate Defendant properly").

## CONCLUSION

For the reasons set forth above, defendant Kolon Industries, Inc.'s MOTION TO QUASH SERVICE AND TO DISMISS INDICTMENT (Docket No. 21) is granted in part and denied in part. The summons is quashed. The arraignment previously set for March 6, 2013 is cancelled. To the extent that it seeks the dismissal of the Indictment, the motion is denied.

Finally, the Clerk of the Court is directed, upon request of the United States, to issue a summons requiring Kolon to appear for arraignment before the Court on June 7, 2013 at 10:00 a.m. EDT or, if the summons is not served by that date, then on

the third Tuesday following delivery of the summons to Kolon under the MLAT, at 10:00 a.m. EDT. In either event, the United States shall file a notice with the Court, upon confirmation of delivery, indicating the date of service on Kolon and the commanded date of appearance. And, the United States is directed to proceed expeditiously to effectuate delivery in South Korea under the MLAT with the caveat that the Court expects the Department of Justice and the Department of State to give this matter the degree of priority that will assure service of the summons at the earliest possible time, it being a matter of importance to the United States and the defendant that the issues presented in the Indictment be resolved at the earliest possible date.

It is so ORDERED.

_____ /s/ _____   *REP*
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 22, 2013